**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

COSTAR GROUP, INC.
1331 L Street, NW
Washington, D.C., 20005

and

COSTAR REALTY INFORMATION, INC.,
1331 L Street, NW
Washington, D.C., 20005

              Plaintiffs,

          v.

LEON CAPITAL GROUP, LLC,
3500 Maple Avenue, Suite 1600
Dallas, Texas, 75219

             Defendant.

Civil Action No. 1:21-cv-02227

## COMPLAINT

Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively "CoStar") through its undersigned counsel, bring this Complaint against Defendant Leon Capital Group, LLC ("Leon Capital") and allege as follows:

### NATURE OF THE ACTION

1.      CoStar is the nation's leading provider of commercial real estate information, and operates the nation's most comprehensive commercial real estate information database.  The database, into which CoStar has invested billions of dollars and decades of research, is made available for a monthly subscription fee, generating significant revenue for CoStar.

2.      CoStar brings this case against Leon Capital to redress its unauthorized access to, and use of, CoStar's database, as well as Leon Capital's breach of its now-terminated subscription license to the CoStar database.

3.      Leon Capital's license to access the database was terminated in May 2021 after CoStar learned that Leon Capital's founder and CEO, in that capacity, was advising and directing CoStar's competitor Commercial Real Estate Exchange, Inc. ("CREXi"), and holding himself out as the "co-founder" of CREXi.   The license does not permit such competitive access.   Upon termination, the remaining license payments were due immediately.   Leon Capital has refused to pay the remaining license payments, despite requests to Leon Capital itself and its counsel.

4.      Even worse, after termination and while refusing to make payment, Leon Capital surreptitiously continued to access and use the CoStar subscription database without authorization. It hacked into the database using access credentials obtained from its Managing Director's prior employer.   And it did so in secret while telling CoStar that it no longer had any use for CoStar's database.   Indeed, the very day after CoStar canceled Leon Capital's license, Leon Capital's Managing Director used the stolen credentials to access CoStar's database.   Shortly thereafter, Leon Capital downloaded *hundreds* of CoStar records from the database.

5.      Leon Capital's wrongdoing is willful, and part of a broader attack on CoStar. CREXi, the CoStar competitor co-founded and advised by Leon Capital, was sued by CoStar last year for infringing more than 10,000 of CoStar's copyrighted images, misappropriating CoStar's data and services, and—tellingly—accessing the CoStar subscription database without authorization.   CREXi obtained that access in exactly the same way as Leon Capital: hacking into the database by using pilfered credentials obtained from legitimate license-holders.   Yet despite that lawsuit (and CoStar's prior successful lawsuits against others who have engaged in the same wrongdoing), Leon Capital made the calculated, and brazen, decision to use stolen credentials to secretly access CoStar's database and download masses of data.

6.      Leon Capital's current copycat misconduct is also consistent with history.   Leon

Capital was instrumental in the founding of CREXi, and CREXi's founding was based on data misappropriated from Ten-X, now part of CoStar. Ten-X sued CREXi for misappropriation, and CREXi was enjoined from using the information that it stole from Ten-X and made a seven-figure damages payment. At the time, CREXi's founder Michael DeGiorgio apologized for the wrongdoing. Nevertheless, CREXi, advised by Leon Capital, has continued to build its business on stolen information, including data swiped from the CoStar database. Leon Capital has followed suit.

7.  CoStar has successfully pursued actions in federal courts around the country against other entities, like Leon Capital, that have hacked into CoStar's subscription database by using passwords issued to legitimate subscribers. For example, in *CoStar Group, Inc. v. SandBox Real Estate and Development LLC*, the District of New Jersey permanently enjoined a brokerage company and its employee from accessing the CoStar database without authorization and entered a judgment of $500,000 based on the fraudulent conduct. No. 2:18-cv-14611-JLL-SCM (D.N.J. Jan. 1, 2019), ECF No. 13. The Northern District of California entered a similar judgment in *CoStar Group, Inc. v. Mahoney & Associates Commercial Real Estate*. No. 5:18-cv-06096-NC (N.D. Cal. Jan. 10, 2019), ECF No. 22.

8.  Those precedents, and the pending case against CREXi, have not deterred Leon Capital. CoStar seeks damages to redress the harm that it has suffered as a result of Leon Capital's actions and injunctive relief to preclude any further wrongdoing.

## THE PARTIES

9.  Plaintiff CoStar Group, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia, 20005.

10.  Plaintiff CoStar Realty Information, Inc. is a corporation organized and existing

under the laws of the State of Delaware with its principal place of business and corporate offices located at 1331 L Street, NW, Washington, District of Columbia, 20005.  It is a wholly owned subsidiary of CoStar Group, Inc.

11.     Defendant Leon Capital, LLC is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business and corporate offices located at 3500 Maple Avenue, Suite 1600, Dallas, Texas, 75219.

## JURISDICTION AND VENUE

12.     This action arises under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.  The Court has federal question jurisdiction over claims arising under this statute pursuant to 28 U.S.C. §§ 1331.  The Court has supplemental  jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal-law claims that they form part of the same case or controversy.  The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as the parties in this action are diverse, and the amount in controversy exceeds $75,000.

13.     Personal jurisdiction and venue over Leon Capital are proper because Leon Capital agreed to submit to the jurisdiction of this Court pursuant to the License Agreement and Terms of Use at issue in this matter.   Under Section 18 of CoStar's Terms and Conditions, incorporated into Leon Capital's License Agreement, as well as CoStar's Terms of Use, agreed to by Leon Capital, the Licensee (Leon Capital) "irrevocably consents to the jurisdiction and venue of the federal and state courts located in the District of Columbia . . . for purposes of any action brought against Licensee in connection with this Agreement or use of the Licensed Product."  This action arises in connection with Leon Capital's License Agreement and use (and subsequent misuse) of CoStar's database, the Licensed Product.

## FACTUAL ALLEGATIONS

### *CoStar's Business*

14.     Founded in 1987, CoStar employs more than four thousand people worldwide.  As a result of these employees' diligent efforts—and the investment of over $5 billion over the last three decades—CoStar has developed the most comprehensive database of commercial real estate information in the world, which includes painstakingly-researched and verified data about commercial real estate properties and transactions, integrated with millions of copyrighted photographs.

15.     CoStar and its affiliates expend enormous time and resources to populate and maintain the CoStar database, including averaging 24,000 thousand phone calls per day to brokers, owners, developers, and other real estate professionals, canvassing a half million properties per year nationwide, and taking nearly one million photographs annually.  CoStar's marketing research operations make millions of data changes to the CoStar database each day.  CoStar works continuously to verify that the data contained in its database are up-to-date and reliable.

16.     While the subscription database provides exceptional benefits to CoStar's paying customers, it also has a positive impact on consumer welfare in the larger commercial real estate ecosystem.  CoStar's subscription database provides greater transparency in the form of readily available, professionally researched, and regularly updated commercial real estate information. The existence of this information has made traditional commercial real estate transactions more efficient, and has also facilitated a more diverse range of commercial real estate deals.  The net result is greater liquidity and significantly mitigated risk in one of the world's most valuable and important asset classes: commercial real estate.

17.     The important role that CoStar plays in the commercial real estate market is demonstrated by the extent to which its users interact with the service.  Each day, users conduct

nearly nine million searches for commercial real estate on CoStar products, including its subscription database.  CoStar estimates that its products play a part in supporting one trillion dollars of commercial real estate leases, sales, and mortgage originations in the United States each year.

18.     CoStar's database is the engine that drives CoStar's business, attracting paying subscribers, licensees, and users, and powering its various information services, analytical tools, and digital marketplaces.

19.     CoStar licenses its database for a monthly subscription fee.  Those fees, which vary based on a number of factors, generate significant revenue for CoStar.  While the marginal cost of any single unauthorized access may be limited, in the aggregate stealing access to CoStar presents a major threat to the ongoing viability of CoStar's products.

***CoStar Goes to Significant Lengths to Protect its Databases Through Technological Means and Terms of Use***

20.     CoStar goes to significant lengths to protect the data that it makes available.  For example, CoStar contractually prohibits customers from sharing passwords, and employs password authentication modes that vary according to risk, firewalls, and other software to limit access and manipulation of its data.

21.     In addition to its state-of-the-art anti-piracy technology, CoStar operates its own anti-piracy program, which includes monitoring suspicious activity and unauthorized uses of its subscription database.  That program—which caught the unauthorized access at issue here—is also costly to administer.

22.     CoStar also carefully structures its license agreements to ensure that all licensees have a clear duty to maintain the confidentiality of CoStar's proprietary information.

23.     Further, because the contents of the subscription database—including CoStar's

photographs and professionally researched data—are central to its business, as part of its ordinary course of business, CoStar registers its photographs with the United States Copyright Office.

24.     As a significant investor in CREXi, a company CoStar is currently litigating against, and a savvy investment entity in its own right, Leon Capital is fully aware of the contractual obligations CoStar requires of its customers, as well as the steps CoStar takes to protect its subscription database.

25.     Leon Capital is subject to two contractually binding sets of terms: (1) CoStar's Terms and Conditions (Commercial) (hereafter, "Terms and Conditions") (attached as Exhibit A) and (2) CoStar's Terms of Use ("Terms of Use") (attached as Exhibit B).

26.     Leon Capital's License Agreement (the "License Agreement") (attached as Exhibit C), to which Leon Capital is also bound, explicitly incorporates by reference the Terms and Conditions, and Leon Capital agreed to the Terms of Use when it accessed the subscription database online.

27.     In order to log into the CoStar subscription database, users, including Leon Capital's employees, must enter their username and password on a login page.  Below the "Log In" button, users are reminded, "By clicking 'Log In', I accept CoStar's Terms of Use."  The text includes a conspicuous hyperlink (in blue font) to CoStar's Terms of Use:



28.     Leon Capital employees, including its Managing Director Sean Wood, clicked on this "Log In" button on over 100 occasions while improperly attempting to access the database within the course and scope of their employment for Leon Capital throughout May and June 2021.

29.     In addition, before users (such as Leon Capital's employees) first log into CoStar's subscription database, CoStar sends them an email reminding them that their use of CoStar's database is subject to CoStar's Terms of Use.  The email states, "Use is subject to the CoStar Terms of Use.  By logging in, you agree to be bound by such terms."  Leon Capital employees received these emails.  For example, Connor White received an email regarding CoStar's Terms of Use on January 29, 2021.

30.     Further, after initially logging into CoStar's database, users (such as Leon Capital's employees) are periodically required to agree (again) to CoStar's Terms of Use.  Every 30 days, or upon login if the user has not logged in for 30 days, a pop-up window appears that displays CoStar's Terms of Use and requires the user to affirmatively agree to the terms before proceeding to the database, by clicking "Accept":



31.     Thus, for example, if a user has not logged into CoStar's database for 45 days, the next time the user logs in and tries to access information, the pop-up window will appear, and the user must re-accept the terms in order to gain access.  Users who decline are redirected to the homepage.  The text at the top of the pop-up window states: "YOUR USE OF THIS WEBSITE CONSTITUTES YOUR AGREEMENT TO BE BOUND BY THESE TERMS OF USE."  While accessing the database for purposes of his work at Leon Capital, Leon Capital's Managing Director, Sean Wood, accepted CoStar's terms on behalf of Leon Capital by clicking "accept" on the pop-up window on June 9, 2021.

32.     CoStar's users, including Leon Capital employees, are also reminded of their obligation to abide by CoStar's Terms of Use throughout their interactions with the database.  For example, when a user attempts to export (i.e., download) data from portions of CoStar's databases, text at the bottom of the page reads, "By using this site, you agree to our Terms of Use.  As with the login page, "Terms of Use" is a hyperlink, and clicking those words displays CoStar's Terms of Use.  Leon Capital Managing Director Wood would have seen this text when he exported data

from portions of the CoStar database, discussed below in Paragraph 61, in May and June 2021.

33.     Moreover, when users, such as Leon Capital employees, view other results in the subscription database, the bottom of results pages also advises: "By using this site, you agree to our Terms of Use." As with the login page, "Terms of Use" is a hyperlink, and clicking those words displays CoStar's Terms of Use. Leon Capital's Managing Director Wood would have seen this hyperlink at the bottom of results pages as he utilized the database throughout May and June 2021.

34.     As a result of these numerous and conspicuous notices, Leon Capital had actual and constructive notice that its use of CoStar's subscription database is subject to CoStar's Terms of Use, which form a binding contract. CoStar's Terms of Use make clear that they form a binding contract, stating: "By accessing or using this Site (or any part thereof), you agree to be legally bound by the Terms of Use that follow . . . . They constitute a legal contract between you and CoStar . . . ." This term is industry standard.

35.     Both CoStar's Terms and Conditions and the Terms of Use explicitly and clearly prohibit access and/or use by competitors, both direct and indirect. CoStar's Terms and Conditions provide that the "Licensee shall not . . . access or use the Licensed Product if Licensee is a direct or indirect competitor of CoStar." Likewise, CoStar's Terms of Use also expressly forbid competitors from accessing, using, or transmitting any portion of CoStar's content in the subscription database service:

> [Y]ou shall not . . . (2) Access or use any portion of the Product if you are a direct or indirect competitor of CoStar, nor shall you provide, disclose or transmit any portion of the Product to any direct or indirect competitor of CoStar (by way of example, a "direct or indirect competitor" of CoStar includes, but is not limited to, Internet listing services or other real estate information services and employees, independent contractors and agents of such services).

36.      This restriction can come as no surprise to Leon Capital: it is also industry standard.  Many other commercial real estate marketplaces—such as those operated by 42Floors, Inc., Catalyst Real Estate Software, Inc., Yardi Systems, Inc., and Brevitas, Inc.—prohibit competitive use of their websites.

37.     CoStar's Terms and Conditions also provide that "CoStar may terminate any portion of this Agreement immediately without further obligation to Licensee: (1) upon CoStar's good faith determination of any violation by Licensee of any provision of Section 1, 2, 3 or 13(a) hereunder."  Further, "[u]pon Licensee's breach of any term of this Agreement that leads to a termination of this Agreement, all License Fees and all other fees payable hereunder shall become immediately due and payable in full."

38.     The Terms of Use provide that only "Authorized Users" may access CoStar's password-protected services, and that users may not "access any portion of a Passcode Protected Product unless you are an Authorized User for such Passcode Protected Product using the Passcodes assigned to you by CoStar to access the components and services of the Passcode Protected Product that your License Agreement authorizes you to access."  In other words, using credentials issued to another person is strictly prohibited.

39.     An "Authorized User" is defined as "an individual (a) employed by a CoStar Client or an Exclusive Contractor (as defined below) of a CoStar Client at a site identified in the License Agreement, and (b) who is specified in the License Agreement as a user of a specific Passcode Protected Service and represented by the Client to be an employee or Exclusive Contractor of the Client.  An 'Exclusive Contractor' is defined as an individual person working solely for the CoStar Client and not another company with real estate information needs or for themselves and performing substantially the same services for such CoStar Client as an employee of such CoStar

Client."

40.     In short, an individual may not use CoStar credentials obtained through a previous employer to access or use the CoStar subscription product once that person has left the employer (because they are no longer "employed by a CoStar Client") or if they are acting as a "direct or indirect competitor of CoStar" (even if also employed simultaneously by a CoStar Client).  Nor may the person use those credentials (even of a current employer) at any time to "provide, disclose, or transmit" information to CoStar's competitors.

41.     As set forth in more detail below, Leon Capital violated CoStar's Terms and Conditions and Terms of Use, and fraudulently accessed and used CoStar's subscription database without authorization.

### *Leon Capital Violated CoStar's Binding Terms and Conditions and Terms of Use*

42.     Leon Capital is a competitor, or at the very least an indirect competitor, of CoStar. Leon Capital's website advertises Leon Capital's CEO and founder, Fernando De Leon, as a "co-founder" of CREXi.  Mr. De Leon's public statements indicate that Leon Capital promotes CREXi, directs customers to the company, and has continuously advised CREXi on business strategy.

43.     In an interview with CREXi posted on CREXi's website on September 1, 2020, Mr. De Leon stated that he helped CREXi "refine their business model" and "champion[ed] the platform to brokers and other professionals"  and that he "asked all the brokers we deal with to use CREXi," "introduced CREXi to many investment sales brokers," and that Leon Capital "[was] able to take insight from those brokers back to CREXi's team and help them shape the products that *we* [sic] offered and the platform accordingly."  (Emphasis added.)

44.     Mr. De Leon also stated that "[m]y involvement in CREXi hasn't changed much: I join in on semi-monthly touchpoints with Mike [the CREXi CEO] and advise on new ideas and strategic moves."

45.     On March 5, 2021, CoStar asked Leon Capital to explain Mr. De Leon's public statements concerning his and Leon Capital's business relationship with CREXi.  Despite a second request on April 21, 2021, Leon Capital failed to address any of CoStar's concerns regarding Mr. De Leon's statements, namely that Leon Capital is competing with CoStar while simultaneously using CoStar's subscription database.  Accordingly, CoStar concluded that Leon Capital is a competitor, or at the very least an indirect competitor, of CoStar through its relationship with CREXi.

46.     As a competitor, Leon Capital is prohibited from using CoStar's subscription services pursuant to CoStar's Terms and Conditions, which are incorporated into Leon Capital's subscription license.

47.     Term 2 of CoStar's Terms and Conditions provides that any licensee shall not "access or use the Licensed Product if the Licensee is a direct or indirect competitor of CoStar." Given his public statements, it is clear that Mr. De Leon, in his role as CEO of Leon Capital, has maintained an extensive and involved business relationship with CREXi, one of CoStar's competitors.

48.     Under Term 6 of CoStar's Terms and Conditions, "CoStar may terminate any portion of this Agreement immediately without further obligation to Licensee: (1) upon CoStar's good faith determination of any violation by Licensee of any provision of Section 1, 2, 3 or 13(a) hereunder."

49.     Term 6 also contains an acceleration clause: "Upon Licensee's breach of any term of this Agreement that leads to a termination of this Agreement, all License Fees and all other fees payable hereunder shall become immediately due and payable in full."

50.     Further, Term 7 of the Terms and Conditions provides that after termination of a

license, CoStar may audit the Licensee to ensure that it has deleted and destroyed all elements of CoStar's product.  This audit occurs at CoStar's expense and requires the cooperation of the Licensee.

51.     CoStar asked Leon Capital and Mr. De Leon to explain his public statements regarding Leon Capital's business relationship with CREXi on two separate occasions, and he refused to do so.

52.     Accordingly, upon CoStar's good-faith determination that Leon Capital is a competitor (or at the very least an indirect competitor) of CoStar, on May 24, 2021, CoStar, in writing, exercised its right to terminate the contract, sought payment of the fees owed for the remainder of the contract term under the acceleration clause, and requested Leon Capital's cooperation with an audit.

53.     To date, three months later, Leon Capital has failed to pay the amount due to CoStar under the contract, totaling $47,081.28 and has failed to respond to CoStar's request for an audit.

***Leon Capital Accesses CoStar's Database Without Authorization and Downloads Hundreds of Records***

54.     On April 19, 2021 Leon Capital, through counsel, told CoStar that Leon Capital would "no longer use its subscription with CoStar."  Notwithstanding that unequivocal representation, and notwithstanding the fact that CoStar cancelled Leon Capital's subscription on May 24, 2021, Leon Capital has continued, covertly, to access and use CoStar's product.  Indeed, the *very day* after the cancellation, Leon Capital's Managing Director Wood accessed the CoStar product without authorization, in violation of CoStar's Terms of Use.  In May and June 2021, following CoStar's termination of Leon Capital's contract, Mr. Wood, acting within the course and scope of his employment for Leon Capital, improperly and without authorization exported over *five hundred* (500) records that CoStar works to provide and maintain at significant cost.

55.     Leon Capital was able to gain access to the password-protected database without authorization, and download masses of data, by using the same improper means as that employed by its associate and advisee CREXi: using credentials issued to other, legitimate, licensees.

56.     Following the termination of Leon Capital's subscription contract on May 24, 2021, Leon Capital's Managing Director Wood continued to access CoStar's subscription database and servers without authorization, on behalf of and within the course and scope of his employment for Leon Capital, using credentials issued to Dalfen Industrial, his previous employer.

57.     Around May 1, 2021, Leon Capital hired Mr. Wood to "spearhead the growth of Leon Capital Group's industrial development and investment platform."  On information and belief, Mr. Wood has continuously maintained his employment with Leon Capital since around May 1, 2021.

58.     Beginning on May 25, 2021, Mr. Wood began using a device associated with Leon Capital.  The device was named "LCG – CW," and utilized hundreds of times by Connor White (i.e. "CW"), a Development Associate at Leon Capital Group, between January and May 2021. On information and belief, LCG is an abbreviation of "Leon Capital Group."

59.     As noted above, every time Mr. Wood, acting as Leon Capital's Managing Director, logged into the CoStar subscription database on the Leon Capital device, he was notified that he was accepting the Terms of Use.  Further, on at least one occasion while acting as Managing Director, on June 9, 2021, a pop up window appeared with the Terms of Use and Mr. Wood affirmatively accepted CoStar's terms by clicking "Accept."

60.     Mr. Wood's usage of the CoStar product increased significantly after he began at Leon Capital, as compared to his usage of the Costar database when employed by Dalfen Industrial.  Indeed, Mr. Wood logged more activity in the CoStar database in May 2021 than in

any other month in his history with CoStar, accumulating nearly 30,000 hits.  And while during his time at Dalfen Industrials he had not conducted exports from the CoStar product; however, once he starting working at Leon Capital, that activity spiked.

61.     Indeed, in his role as Leon Capital's Managing Director, Mr. Wood mined the CoStar database for data.  After beginning at Leon Capital, Mr. Wood conducted no fewer than 97 CoStar sessions, accumulating nearly 50,000 hits.  He conducted exports of nearly 500 records related to industrial properties in the Phoenix and Dallas markets, as well as at least 25 sales transaction records.  There is no question that these records were downloaded for use by, and on behalf of, Leon Capital, which is based in Texas and is involved in real estate projects across Arizona and Texas.  Mr. Wood downloaded these records, within the course and scope of his employment, for Leon Capital after CoStar terminated Leon Capital Group's License.

62.     Mr. Wood continued to access CoStar's database without authorization through June 2021, accumulating over 20,000 hits in June 2021.

63.     Because of unusual activity on his account, on or around June 21, 2021 CoStar sent an email to Mr. Wood's registered email address, notifying him that additional security features would be added to his account.

64.     Despite the enhanced security, Mr. Wood continued to access CoStar on behalf of Leon Capital, and within the course and scope of his employment for Leon Capital.  On each occasion, he represented (falsely) that he was an authorized user of the CoStar database.

65.     On August 12, 2021, CoStar terminated Mr. Wood's access under the Dalfen Industrial license.

66.     Mr. Wood is not the only Leon Capital employee to have used credentials issued to their previous employer to access Costar's database without authorization.

67.     Corbin Stall, who previously worked at Jones Lang LaSalle, Inc. ("JLL"), was hired by Leon Capital around May 1, 2021 to "assist[] in all aspects of industrial acquisitions and development."  On information and belief, Mr. Stall has continuously maintained his employment with Leon Capital since around May 1, 2021.

68.     On at least May 25 and May 28, 2021, Mr. Stall used his JLL credentials to access the CoStar database.

69.     Each time Mr. Stall logged into the subscription product, he was notified that he was accepting the Terms of Use.

70.     On August 12, 2021, CoStar terminated Mr. Stall's access under the JLL license.

71.     Leon Capital is responsible for the unauthorized access to, and copying from, CoStar's database.  Sean Wood is a Managing Director of the company who utilized a device consistently associated with Leon Capital to access the database and download hundreds of records.  And the content of those records indicate that Leon Capital was using them for its own benefit and business, namely, in connection with its industrial development platform.

72.     All actions alleged to be taken by employees of Leon Capital, including their entry into a contract with CoStar, are alleged, on information and belief, to have been taken within the course and scope of employment of, on behalf of, at the direction of, and for the benefit of Leon Capital, and authorized or ratified by Leon Capital.

73.     In particular, Mr. Wood within the course and scope of his employment, on behalf of, and for the benefit of Leon Capital used the CoStar database to obtain information about industrial properties, the reason he was recently hired by Leon Capital.  The access occurred from a device associated with Leon Capital, and the content accessed related to properties in Phoenix and Dallas, consistent with Leon Capital's scope of business.  Further, Mr. Wood's access in May

2021 was substantially distinct from his previous use of the CoStar product.  This change in usage directly corresponds to his change in employment.

74.     That Leon Capital's misconduct was knowing, willful and undertaken with the intent of harming CoStar is further underscored by Leon Capital's close association with CREXi. Not only has CREXi engaged in the exact same conduct—hacking into CoStar's database using credentials issued to legitimate clients—but CoStar sued CREXi as a result, setting forth in detail the reason why the conduct was unlawful and harmful.  Leon Capital is familiar with that lawsuit, but nevertheless proceeded to engage in the same wrongdoing.

75.     Like CREXi, Leon Capital made a calculated, willful, and brazen decision to steal and free-ride on CoStar's products and services.

76.     Leon Capital's free-riding on an authorized user's license caused financial harm to CoStar and its paying subscribers.

77.     Based on prior precedent, CoStar is entitled to damages of *at least* hundreds of thousands of dollars, if not significantly more.

### FIRST CLAIM FOR RELIEF
### Breach of Contract – Subscription License Agreement (Non Payment)

78.     CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

79.     Leon Capital agreed to CoStar's Terms and Conditions pursuant to its License Agreement, Exhibit C.

80.     CoStar has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the License Agreement.

81.     CoStar's Terms and Conditions prohibit competitors from accessing, using, or transmitting any portion of CoStar's content in the subscription database.

82.     As described above, Leon Capital is a competitor of CoStar, and accessed and used CoStar's content, in violation of CoStar's Terms of Use.

83.     CoStar's Terms and Conditions provide that CoStar may terminate the License Agreement upon CoStar's good faith determination of any violation by the Licensee of the License Agreement.

84.     CoStar terminated Leon Capital's License Agreement pursuant to its good faith determination that Leon Capital is a competitor of CoStar.

85.     CoStar's Terms and Conditions also provide that upon Leon Capital's breach of any term of the License Agreement, and following CoStar's termination, all License Fees shall become immediately due and payable in full.

86.     Despite proper termination of the License Agreement and request for payment of fees, Leon Capital has failed to pay.  CoStar has been damaged by the amount due under the contract, totaling $47,081.28.

## SECOND CLAIM FOR RELIEF
### Breach of Contract – Terms of Use (Improper Access and Use)

87.     CoStar repeats and realleges each and every allegation set forth above and incorporates them herein by reference.

88.     Use of CoStar's subscription database is subject to contractually binding Terms of Use.  Such terms are common in the industry, and as a sophisticated business entity, Leon Capital and its employees would be well aware of both the presence and binding nature of the Terms of Use.

89.     Leon Capital had actual and/or constructive knowledge that access to the CoStar database is subject to CoStar's Terms of Use.  As described above, Leon Capital's Managing Director, acting within the course and scope of his employment for Leon Capital, and for Leon

Capital's benefit, affirmatively accepted CoStar's Terms of Use that appeared in a pop-up window on June 9, 2021.  Additionally, Leon Capital was on notice of CoStar's Terms of Use because references to CoStar's Terms of Use appear: (1) directly below the log-in button for the CoStar database, a log-in button used repeatedly by Leon Capital's Managing Director and at least one other Leon Capital employee; (2) in an email to users before they log into the database for the first time, an email received by Leon Capital employees, including Connor White on January 29, 2021; (3) at the bottom of the page when users export data from portions of CoStar's database, an action completed by Leon Capital's Managing Director; and (4) at the bottom of each results page, which would have been seen by Leon Capital's Managing Director throughout his interactions with the database.  Leon Capital, through its Managing Director and at least one other employee, had clear and explicit notice that its use of the database was subject to CoStar's Terms of Use.

90.     CoStar's Terms of Use prohibit competitors from accessing, using, or transmitting any portion of CoStar's content in the subscription database.

91.     CoStar's Terms of Use also explicitly require that an Authorized User be "employed by the Licensee" to lawfully utilize the subscription product, and prohibit using a passcode to access the subscription product for services other than those authorized under a particular License Agreement.

92.     CoStar has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with its Terms of Use.

93.     In direct breach of CoStar's Terms of Use, Leon Capital, through its Managing Director, accessed CoStar's subscription database despite being its competitor, in order to use that content to benefit Leon Capital's business.

94.     Further, Leon Capital, through its Managing Director, breached CoStar's Terms of

Use by accessing CoStar's Passcode Protected Product by using a password issued under a different License Agreement, and by storing, copying, and exporting any portion of the Product into any database or other software when he was not an Authorized User (because he was no longer employed by the subscriber).

95.     As described above, Leon Capital's Managing Director acted within the course and scope of his employment for Leon Capital, for Leon Capital's benefit and on its behalf.

96.     Leon Capital's breaches of CoStar's Terms of Use have been material, willful, repeated, and systematic.

97.     Leon Capital caused damage and continues to cause irreparable harm to CoStar by free-riding on another licensee's subscription.

98.     CoStar is therefore entitled to damages in an amount to be proven at trial, injunctive relief, and other relief as the Court deems appropriate.

### THIRD CLAIM FOR RELIEF
### Computer Fraud and Abuse Act (CFAA)

99.     CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

100.    CoStar's computers and servers, located in the United States, are involved in interstate and foreign commerce and communication.

101.    Leon Capital's access to CoStar's computers and servers is subject to its binding terms and conditions.

102.    Leon Capital, through its Managing Director, improperly accessed CoStar's servers without authorization when the Managing Director, acting within the scope and in the course of his employment, and on Leon Capital's behalf, used his former employer's login credentials to access CoStar's database, in violation of CoStar's Terms of Use and for the benefit of Leon Capital.

103.    Authorized CoStar users are provided access to CoStar's password protected platform by way of non-transferable subscriptions between CoStar and its institutional client subscriber.  Access to the subscription product by someone other than an employee or exclusive contractor of the institutional client subscriber (or by a competitor of CoStar) constitutes a violation of CoStar's Terms of Use and a trespass on CoStar's servers.

104.    Leon Capital's repeated unauthorized access to CoStar's computers and servers allowed it to access, obtain, and use CoStar's contractually protected information involving interstate communication in violation of 18 U.S.C. § 1030, specifically data about commercial real estate.

105.    CoStar has suffered over $5,000 worth of damages and losses over a one-year period, in an amount to be proven at trial.  Leon Capital's unauthorized access consumed time and money spent identifying, investigating, and attempting to block and otherwise respond to Leon Capital's unauthorized access, as described throughout this Complaint.  This work included an investigation of the unauthorized actions taken by Leon Capital in CoStar's computer systems once it had gained access, including a review of the resources utilized or diverted by Leon Capital, the data downloaded by Leon Capital, and any other damage done to CoStar's computer systems.  The work consumed significant employee time that could have been spent on other matters.  Further, Leon Capital's unauthorized access has impaired and corrupted CoStar's efforts to measure and analyze legitimate subscriber traffic.  Leon Capital's unlawful conduct undermined the soundness and therefore the value of those data and analyses, which are used for multiple business purposes.

106.    CoStar has suffered and will continue to suffer irreparable harm as a result of Leon Capital's access to its computers and servers without, and in excess of, authorization, which entitles CoStar to injunctive relief.

**FOURTH CLAIM FOR RELIEF**
**Fraud (in the alternative to Claims 2 and 5)**

107.    CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

108.    In the alternative to CoStar's claim for breach of contract, and to the extent there is an absence of a binding agreement between the parties or such agreement is ineffective, Leon Capital is liable to CoStar for common law fraud.

109.    While employed by Leon Capital and acting within the scope of and in the course his employment, Managing Director Wood logged into CoStar's subscription database. By doing so, he represented that he, on behalf of Leon Capital, accepted CoStar's Terms of Use each time he logged into the product.

110.    By accepting CoStar's Terms of Use, Mr. Wood represented to CoStar, on behalf of Leon Capital, that he would not access any portion of a Passcode Protected Product unless he was an Authorized User for such Passcode Protected Product (as those terms are defined in the Terms of Use).

111.    Mr. Wood's representations to CoStar that Leon Capital would abide by CoStar's Terms of Use were false. Every time Mr. Wood accessed CoStar's subscription database in the scope and course of his employment with Leon Capital, and entered the credentials of an Authorized User and Clicked, "Log In," he was representing on behalf of Leon Capital that he was an Authorized User when in fact, as Leon Capital and he knew, he was not, because he was no longer employed by the Licensee of the product.

112.    By using the credentials from his previous employer, Mr. Wood, acting for Leon Capital, deliberately concealed from CoStar the truth about his status as a non-Authorized User,

and thereby, on behalf of Leon Capital, misrepresented his identity when gaining access to and using CoStar's subscription database.  Mr. Wood, acting for Leon Capital, intended for CoStar to rely on his misrepresentation and grant him access to the database.

113.    CoStar relied on the foregoing representations and omissions by providing Leon Capital, acting through Mr. Wood, with the information and data available on its subscription database, which included allowing Mr. Wood, on behalf of Leon Capital, to view and download information on various properties.

114.    Leon Capital's conduct was egregious.  By using fraudulent credentials, Mr. Wood, acting for Leon Capital and within the scope of his employment, acted with willful disregard of CoStar's rights, and intentionally concealed and misrepresented his identity to CoStar in order to access CoStar's database for the benefit of Leon Capital.

115.    As a result of this fraudulent misconduct, CoStar has been damaged in an amount to be proven at trial and is entitled to punitive damages.

### FIFTH CLAIM FOR RELIEF
**Unjust Enrichment (in the alternative to Claims 2 and 4)**

116.    CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

117.    In the alternative to CoStar's claims for breach of contract and fraud, and to the extent there is an absence of a binding agreement between the parties or such agreement is ineffective, Leon Capital is liable to CoStar under the doctrine of unjust enrichment.

118.    CoStar expects that any user of its database is an Authorized User (as that term is defined in the Terms of Use) who pays, or who is employed by or contracted to an entity that pays, CoStar's subscription fees.

119.    Each time Leon Capital's Managing Director logged in and used the CoStar

database in the course and scope of his employment with Leon Capital and on its behalf, he willingly accepted a benefit for Leon Capital that he and Leon Capital knew or should have known they did not pay for.

120.    By accessing the CoStar database, Leon Capital received and retained the benefit of CoStar subscription issued to a third party, without paying for that subscription, and had knowledge of the benefits CoStar conferred upon it as a result of such unlawful access.

121.    Leon Capital voluntarily accepted, retained, and received the benefits CoStar provided and was enriched by those benefits.

122.    Leon Capital's acceptance and retention of these benefits under the circumstances make it inequitable and unjust for it to retain the benefit without payment to CoStar.

123.    Leon Capital has been unjustly enriched at the expense of CoStar, and as a result, CoStar is entitled to an award reflecting the value of the services Leon Capital obtained, the benefits it received from those services, and the profit it obtained as a result.

### PRAYER FOR RELIEF

WHEREFORE, CoStar prays for judgment against Leon Capital as follows:

A.    For an award of $47,081.28, the amount due under Leon Capital's License Agreement;

B.    For an award pursuant to 18 U.S.C. § 1030(g) of compensatory damages;

C.    For an award of damages arising from Leon Capital's breaches of CoStar's Terms of Use and the misappropriation of CoStar material as a result of those breaches or, in the alternative, for an award of damages arising from Leon Capital's materially false representations and the unauthorized access to CoStar's proprietary database that resulted from such misrepresentations, or, in the alternative, for an award reflecting the value of the services Leon Capital obtained and disgorging all profits, benefits, and other compensation obtained by Leon

Capital;

> D.      For a permanent injunction (1) barring Leon Capital's continued unauthorized access to CoStar's computers and servers; (2) barring Leon Capital from sharing or distributing any content impermissibly acquired from CoStar's database with any other organization or individual; (3) ordering Leon Capital to identify to CoStar the location of all such content in whatever form it may now take, wherever stored (including without limitation in the systems of third parties), and however altered or manipulated, and the identities of all individuals and entities to whom or which Leon Capital transferred any such content; (4) ordering Leon Capital to segregate and render inaccessible to its employees and all third parties (other than CoStar) all content Leon Capital impermissibly acquired from CoStar's database, in whatever form, wherever stored (including without limitation in the systems of third parties), and however altered or manipulated; (5) ordering Leon Capital to identify all benefits and profits that resulted from such information; and (6) ordering Leon Capital to cooperate fully with the contractual audit request issued by CoStar;

> E.      For further permanent injunctive relief as deemed necessary by the Court;

> F.      For an award of CoStar's costs, including its reasonable attorneys' fees and disbursements of counsel, as permitted by law;

> G.      For prejudgment and post-judgment interest, as permitted by law;

> H.      For punitive damages to the extent available; and

> I.      For such further and additional relief as the Court may deem just and proper.

## JURY DEMAND

CoStar demands a trial by jury on all issues properly tried to a jury.

Dated:  August 20, 2021

Respectfully submitted,

*/s/ Nicholas J. Boyle*

NICHOLAS J. BOYLE
D.C. Bar No. 481098
nicholas.boyle@lw.com
SARAH A. TOMKOWIAK
D.C. Bar No. 987680
sarah.tomkowiak@lw.com
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200

Attorneys for Plaintiffs